# CONTRACT MANUFACTURING AGREEMENT

This Agreement made this 1st day of September 2009, between

TRUEGREEN ELECTRONICS, INC. (Buyer) a
Corporation, with its principal place of business at
3F.-2, No.5, Lane 118, Sec. 2, Xiuming Rd., Wenshan District, Taipei City 116, Taiwan (R.O.C.)

AND

ACEPOWER ELECTRONICS CO., LTD ("ACE")
with a principal place of business located at
Win Best International Ltd., 5F, No. 153, Sing-An St, Songshan Area, Taipei City, Taiwan (R.O.C.)

sets forth the terms and conditions under which ACE will perform certain production work on behalf of the Buyer.

1.0 GENERAL TERMS & CONDITIONS

1.1 LIABILITY

Except as otherwise provided in this Agreement, neither party shall be liable for special, indirect, incidental or on sequential damage arising out of or in connection with claims brought by third parties, or any indemnifications granted by either party in connection with this Agreement.

1.2 SEVERABILITY

If any provision of this Agreement is held to be invalid or unenforceable, such invalidity of unenforceability shall not affect the enforceability of any other provisions of this Agreement not held to be invalid.

1.3 AMENDMENTS

Modification of this Agreement must be made in writing, signed by a duly authorized Corporate Officer of each party. No Amendment shall be deemed effective, until a duplicate original of such Amendment is received by each party.

1.4 COMPLIANCE WITH THE LAW

Both parties agree to comply with all applicable laws, rules and regulations with regard to the performance of its obligations under the Agreement and indemnify and hold the other party harmless from any loss resulting from its failure to obey all such laws, rules and regulations. This Agreement is made in, governed by, and shall be construed in accordance with the laws of The Commonwealth of Massachusetts including, unless provided otherwise herein, the Uniform Commercial Code as implemented in Massachusetts General Laws.

1.5 WAIVER

Either party's failure to exercise, in whole or in part, or delay in exercising any right under this Agreement will not preclude any future exercise of the same right or the exercise of any other right hereunder.

1.6 All notices pertaining to this Agreement shall be in writing, delivered to the party/s at this address set forth below.

| | |
|---|---|
| To: Ace Power Electronics Co., LTD<br>Win Best International Ltd.,<br>5F, No. 153, Sing-An St,<br>Songshan Area,<br>Taipei City, Taiwan (R.O.C.)<br>Attn: Eric Lien | To: (Buyer): TRUEGREEN Electronics, Inc.<br>3F.-2, No.5, Lane 118,<br>Sec. 2, Xiuming Rd.,<br>Wenshan District,<br>Taipei City 116, Taiwan (R.O.C.)<br>Attn: Bruce Searle |

**Exhibit 6**

### 1.7 FORCE MAJEURE

Neither party will be liable nor deemed to be in default for delay or failure in performance or interruption of service hereunder resulting directly or indirectly from acts of God, wars, floods, riots, labor strikes, worldwide parts shortages, or transportation shortages, provided, however, the provisions of this section shall not apply to obligations to make payments when due. The time for performance so affected or delayed will be deemed extended for the period of such delay. The party claiming excuse for failure to perform due to force majeure shall notify the other party in writing within five (5) days of the existence of the force majeure cause and its expected duration.

### 1.8 PROPRIETARY INFORMATION

Each party hereby agrees for a period of three (3) years from the Effective Date that all information in writing or other physical form delivered to it by the other party which is designated to be proprietary and confidential will be safeguarded in the same manner the receiving party safeguards its own proprietary and confidential information or like character, and will not be divulged to their parties. Information which is initially orally or visually submitted and identified at the time of initial disclosure as proprietary shall be safeguarded by the receiving party only if the submitting party notifies the receiving party in writing within ten (10) business days of such initial oral or visual disclosure, with a specific identification of the proprietary information contained in such initial oral or visual disclosure.

This Agreement shall not impose any obligation upon the receiving party with respect to any portion of the received information with (I) is now, or which hereafter, through no act or failure to act on the party of the receiving party, becomes generally known or available, (II) is known to the receiving party at the time of receiving such information, (III) is furnished by the disclosing party to others without restriction on disclosure, (IV) is hereafter furnished to the receiving party by a third party, as a manner or right and without restriction on disclosure, (V) is independently developed by the receiving party, or (VI) more than three (3) years after such information is disclosed to the receiving party, or (VII) is authorized in writing for release by the disclosing party.

### 1.9 AUTHORITY

Buyer warrants that it has the unqualified right to enter this Agreement, that it is the owner of or has the right to transfer all rights and licenses to all technology, intellectual property and other deliverables under the terms of this Agreement, and that it has the right to perform all obligations under this Agreement.

### 1.10 ASSIGNMENT

Neither party may assign or otherwise transfer its rights and obligations under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld.

### 1.11 ENTIRE AGREEMENT

This Agreement sets forth the entire agreement and understanding between the parties with respect to the subject matter hereof and merges all prior discussions and negotiations between them. There are no oral representations or inducements pertaining thereto which are not contained herein; and neither of the parties hereto shall be bound by any conditions, warranties, understandings to representations with respect to such subject matter other than as expressly provided herein.

### 1.12 NON-LICENSING

The parties understand that except as may be otherwise expressly stated herein, the terms and conditions of the Agreement shall not be considered in any way as a grant of any license whatsoever under either party's present or future trademarks, trade secrets, or other proprietary rights, nor is any such license granted by implication, or otherwise.

### 2.0 WORK SCOPE

During the term of this Agreement, ACE will supply product that meets all assembly, test, quality and documentation requirements at a cost provided in the quotation for the product, and on a delivery schedule guided by the purchase order. Assembly & test, labeling and production records must meet all applicable TUV regulations and ISO 9,000 product standards. Product is assembled, tested and labeled per customer specifications. Customer has responsibility to ensure their specifications meet applicable regulatory requirements and effectively communicate requirements to ACE.

Case 09-46902-PBS    Doc 73-2    Filed 11/18/09    Ent. 11/18/09 08:55:50    Pg. 2 of 10

ACE shall manufacture, sell and deliver product, listed on Exhibit A, exclusively to Buyer under the terms and conditions of this Agreement. All parts and components purchased and inventory used in the construction of the Product, shall be sourced from the Buyer's AVL (Approved Vendor List). Parts and components NOT listed on the Buyer's AVL shall NOT be used unless approved by the Buyer. Any modifications to the Buyer AVL must be approved, in writing, by the Buyer, as defined in Paragraph 7.0. ACE shall provide manufacturing and testing for the products in accordance with the Buyer's specifications.

3.0 AGREEMENT TERMS AND ORDERING

The terms and conditions of this agreement shall apply to all products listed on Exhibit A and other future products to be manufactured by ACE for Buyer.

The Contract Manufacturing Agreement is good until otherwise modified or terminated by mutual written Agreement.

3.1 TERM OF AGREEMENT

The Initial Term of this Agreement is twenty four (24) months.

Upon the effective date, and at each subsequent six (6) months, Buyer will provide ACE with a six (6) month rolling forecast of the product to be ordered for the succeeding six (6) month period, and thereafter, in the first week of each succeeding quarter, Buyer will update the six (6) month forecast. The Initial six (6) month forecast will be the base used for setting yearly volumes and determining pricing.

Unless terminated earlier as provided in Section 10.0, the Agreement is automatically renewed at twenty four (24) month increments, unless either party gives written notice to the other party not to renew with not less than 120 days of notice.

3.2 PURCHASE ORDERS/FORECASTS

Buyer will issue a purchase order for the initial Term, with specific release schedules for the first three (3) months and with sufficient time to permit ACE to obtain the long lead-time components. Thereafter, Buyer will maintain a three (3) month window of release schedules and will provide a rolling six (6) month forecast, which will include the three (3) months firm release.

Buyer's purchase orders ("Orders") must be in writing and with the following information: (I) identification of the Products by quantity, model number, revision and description; (II) shipment instructions, including requested shipment date, and (III) price. All orders must incorporate by reference the terms and conditions of this Agreement. The terms and conditions of this Agreement shall supersede all terms and conditions contained in Buyer's purchase orders. All requirements shall be scheduled per the Order, and all scheduled dates shall be regarded as dates of shipment from ACE's facilities.

ACE will utilize the forecast to secure long lead-time components (i.e. components that exceed 8 weeks lead-time.) on behalf of the Buyer. ACE will only procure material based on the available lead time plus the manufacturing offset time.

3.3 RESCHEDULING

Buyer may make changes and reschedule the individual assembly to be manufactured and delivered in accordance with the following;

The order for product in the nearest 3-month period will be non-cancelable, and any orders beyond 3 months may be increased or decreased by an amount agreed to by ACE.

The starting day of the remaining lead-time is defined as the first day of the following month, after the written schedule change notices received by ACE.

3.4 In the case of cancellation, Buyer is responsible for any undamaged material, at quoted standard cost inventoried by ACE in support of Buyers' Purchase Order (s) that is not reusable by ACE or returnable to the supplier. Additionally, Buyer is responsible for any cancellation charges, restocking charges, or any non-cancelable commitments incurred by ACE for such material. Such inventory items will be identified upon the initial execution of this Agreement, and as they become otherwise identified during the course of this Agreement.

3.5 If there is an increase in forecasted requirements, ACE shall make reasonable efforts to service the increase and shall advise Buyers of its efforts to service the increased requirements. Buyer and ACE shall jointly work with suppliers of the long-lead items to ensure that an adequate supply of critical components is available at all times. Buyer will be liable for the material cost plus the quoted material mark-up on long lead items and minimum buy components which ACE has procured either to meet Buyer's forecasts or as a result of written authorization from Buyer.

3.6 In the event that ACE is required to maintain a significant excess inventory as a result of the above (3.4) provision, reductions of the forecast, engineering changes or other Buyer actions, the parties agree to a monthly carrying charge of 1.5% or full prepayment to cover the costs associated with maintaining this inventory. This carrying charge is in addition to Buyer's material liability stated above.

3.7 CONTRACT CANCELLATION CHARGES

For the convenience of the Buyers, and if agreed to by ACE, Buyer may cancel the remaining orders under the following conditions:

a. Buyer pays for all goods already shipped.

b. Buyer pays for all finished goods and work-in-process still at ACE.

c. Buyer pays for all raw materials in ACE inventory that cannot be returned to Vendor for credit.

d. Buyer pays for all non-cancelable materials ordered that are still at Vendors's.

e. Buyer pays for all the cancellation charges incurred by ACE and, once the materials are used or processed or received by ACE, the handling charges incurred by ACE shall apply.

3.8 END OF CONTRACT INVENTORY

Buyer will be responsible for all undamaged material, at quoted standard cost, inventoried by ACE in support of Buyer's Purchase Order that is not reusable by ACE or returnable to the supplier. Additionally, Buyer is responsible for any cancellation charges, restocking charges, or any non-cancelable commitments incurred by AC for such material. Such items will be identified upon the initial execution of this Agreement, and as they become otherwise identified during the course of this Agreement.

4.0 TOOLING, FIXTURES AND PROGRAMS

Tooling, fixtures and set up charges shall be acquired and maintained by ACE, and invoiced to Buyer. Title to fixtures and tools will pass to Buyer upon receipt of payment to ACE. Buyer will be responsible for providing ACE with complete current documentation, documentation changes, special test fixtures, and technical support as needed to build and test product.

5.0 QUALITY ASSURANCE

Printed circuit assemblies will be manufactured in accordance with IPC-A-610A Class 2. All assemblies will comply with Buyer's specifications and drawings. Buyer will provide assistance and guidance to ACE to ensure that the manufacturing, labeling, and production records are in compliance with all applicable TUV and ISO regulations and standards. Production cannot commence until Buyer provides ACE with a written notice that it is in compliance.

6.0 WARRANTY

6.1 WARRANTY PERIOD

Under the condition that ACE's product conforms to Buyer's specifications, ACE warrants its product, for a period of twelve (12) months from the date of shipment.

a. to be free from material and workmanship defects in the case of turn-key project.

b. to be free from workmanship defects in the case of consignment project.

6.2 WARRANTY LIMITATION

This warranty is limited to replacement or repair, at ACE'S option of defective units and does not apply to Units which have been abused or improperly stored, modified, or repaired. ACE will respond to warranty repair claims and, if unable to respond in a timely fashion, agrees to allow the Buyer to repair or have repaired the defective Products, at ACE equivalent time and materials charge-backs to ACE.

ACE's warranty obligations hereunder do not extend to damage caused by improper use of the Product, accident, or operation of the Product outside of the specified environment conditions, by parties other than ACE, its subcontractors, or agents.

The express warranties set forth in this Paragraph are the only warranties given by ACE with respect to any Product furnished hereunder.

6.3 WARRANTY CLAIMS

ACE shall supply Buyer with targeted warranty replacement parts free of charge. Parts targeted as being subject to warranty replacement shall be supplied to Buyer in quantities totaling a maximum of 1% for the total of all units purchased. Additional replacement parts ordered by Buyer shall be purchased at an agreed upon price.

7.0 ENGINEERING CHANGES/TEST FALL-OUT

7.1 Engineering changes (EC's) may be initiated by either party, under the following terms:

a. Buyer gives advance written notice to ACE of any EC requested by Buyer. If the EC is identified as critical by Buyer, ACE will respond to the EC within (forty eight) 48 hours of receipt of such notice. Implementation of the Requested EC is contingent upon material availability. All other EC implementation schedules will be per mutual Agreement.

b. ACE shall provide a written assessment of the anticipated effects of EC's on ACE's schedule and manufacturing costs (including costs associated with scrap and rework, retooling, fixtures, and any changes to the recurring product price). ACE and Buyer shall negotiate in good faith on the costs associated with processing and implementing those EC's.

7.2 For EC's proposed by ACE; ACE shall give advance written notice to Buyer. No EC shall be implemented without Buyer's prior written consent.

ACE shall provide a written assessment of the anticipated effects of any EC on ACE's schedule and manufacturing costs including costs associated with scrap and rework. ACE and Buyer shall negotiate the costs associated with processing and implementing those engineering changes.

7.3 Buyer will reimburse ACE for the reasonable cost as a result of any EC of any parts and/or material or forecast, long lead components and minimum buy components that cannot be used by ACE to produce Products; such cost includes the Contract pricing and material mark-ups. In the case of parts and materials not yet delivered by the suppliers, the Cancellation charges or other liabilities incurred by ACE in canceling such parts and materials shall be borne by Buyer. Buyer will be responsible for all rework or scrap costs incurred by ACE that result from, design, test, component or material changes made by Buyer. ACE shall use reasonable effort to minimize Buyer's liability.

7.4 TEST FALL-OUT

If despite repeated attempts at test and repair, product units fail to pass expectations, such assemblies shall be afforded to the Buyer for engineering evaluation. ACE will be fully reimbursed for the entire units, if the assemblies have failed Because of a design problem. ACE will not be reimbursed if the assemblies have failed because of faulty material or Workmanship.

Page 5

Case 09-46902-PBS    Doc 73-2    Filed 11/18/09    Ent. 11/18/09 08:55:50    Pg. 5 of 10

8.0 PRICES & TITLE/POSSESSION

8.1 PRICING

    a. Unit pricing listed in Exhibit A and shall be specific to the revision level of the assembly.

    b. Except as provided in 8.1e.below pricing cannot be changed without written approval by both parties, which shall not be unreasonably withheld.

    c. All prices are FOB ACE's facility in Taipei, R.O.C or Shanghai, China.. Buyer shall be responsible for and pay all shipping and insurance costs for Products.

    d. All taxes & duties will be borne by Buyer. If sales to buyer are exempt from any taxes, Buyer shall furnish to ACE a Certificate of Exemption from the application taxing authority.

    e. Initial Term pricing shall remain fixed for a minimum of (six) 6 months. Successive 6 monthly intervals of negotiated prices will be firm, for each six (6) month period. If there is a volume change in excess of +/-10% of any forecast, engineering changes, or if there are substantial variations in material cost; e.g., memory prices, the parties agree to analyze the pricing involved and make appropriate adjustments if necessary.

8.2 TITLE

Title of the Products shall be passed to Buyer upon shipment from ACE, Taipei, R.O.C.

9.0 PAYMENT TERMS

Initial Payment terms are to be agreed upon between ACE and Buyer. Once credit performance is established, the standard payment terms is net thirty (30) days from the date of Delivery, FOB Taiwan/China from ACE. ACE reserves the right to change payment terms and credit arrangements at any time if Buyer's financial condition or previous payment record so warrants.

10.0 TERMINATION CLAUSE

10.1 If either party breaches a material provision of these Agreements and the breach is not cured within sixty (60) days after receipt of written notice from the other party specifying the nature of the breach or if a plan is not in place to expeditiously cure such breach, the non-breaching party may terminate the Agreement by written notice to the party in breach.

10.2 Either party may terminate this Agreement by written notice upon the concurrence of any of the following events, unless such event is eliminated or cured within sixty (60) days of notice therefore.

    a. the filing by the other party of a petition in bankruptcy or insolvency; or

    b. any adjudication that the other party is bankrupt or insolvent; or

    c. the filing by the other party of any petition or answer seeking reorganization, readjustment, or rearrangement of the business under any law relating to bankruptcy or insolvency; or

    d. the appointment of a receiver for all or substantially all of the property of other party, or

    e. the making by the other party of any assignment or attempted assignment of the benefit of creditors; or

    f. the institution of any proceedings for the liquidation or winding up of the business or for the termination of the corporate charter of the other party.

10.3 Termination of this Agreement shall not affect the survival of any rights or obligations hereunder which by their nature are to survive and be effective following termination of this Agreement.

Case 09-46902-PBS    Doc 73-2    Filed 11/18/09    Ent. 11/18/09 08:55:50    Pg. 6 of 10

11.0 INDEMNIFICATION

Buyer shall settle or defend, at Buyer's expense, and pay all costs, fines, attorney fees and damages resulting from all proceedings or claims against ACE and its Subsidiaries for infringement or alleged infringement by the units furnished under this Agreement, or any part or use thereof of copyrights, patents, or intellectual property rights now or thereafter existing in the United States or in any other country where Buyer, its Subsidiaries of affiliates heretofore have furnished or furnish similar Units. Buyer shall notify ACE if it is or becomes aware of any right of, or protection afforded to, a third party as set forth above that might affect ACE's ability to provide units under this Agreement. ACE shall provide written notice to Buyer of any such proceeding or claim of which it becomes aware. Buyer will, at ACE's request, identify the countries in which Buyer, its Subsidiaries or affiliates hereto have furnished similar items. The provision states the entire rights and obligations of Buyer and ACE regarding infringement of copyrights, patents, or intellectual property rights now or hereafter existing in the United States or in any other country and shall survive expiration or termination of this Agreement.

**SIGNATURE PAGE**

Manufacturer:

ACE POWER ELECTRONICS CO.. LTD/
WINBEST INTERNATINAL LTD..

_____
ERIC LIEN

Date: September___1___, 2009

Buyer:

TRUEGREEN ELECTRONICS, INC

_____
BRUCE SEARLE

Date: September___1___, 2009

Page 7

EXHIBIT A

YEARLY
( 2009 )

| ASSEMBLY NO. | DESCRIPTION | QUANTITY | UNIT PRICING |
|---|---|---|---|
| | PLASTIC INFRARED HEATER UNITS | 16,000 (approx) | To Be Determined |
| | WOOD INFRARED HEATER UNITS | 5,000 (approx) | To Be Determined |

Page 8

# NON-DISCLOSURE / NON-CIRCUMVENTION AGREEMENT

## By and Between

### TrueGreen Electronics, Inc. (TrueGreen)
A Mauritius Corporation, and

### AcePower Electronics Co., Ltd. (Ace)
(jointly referred to hereinafter as the "Parties")

The Parties agree to the following terms and conditions in connection with the confidential information and disclosures made by TrueGreen to Ace for purposes of:

<u>Contract Engineering, Prototyping Services and Marketing Materials related to infrared heater and air purifier development.</u>

1.  This agreement shall cover any and all proprietary information or copies, know- how, patent information, prototypes, drawings, and all other written or oral communications and materials, manuals and prototypes provided by TrueGreen to Ace. (hereinafter referred to as "proprietary information").

2.  Ace accepts the above referenced information or copies subject to the following terms and conditions:

    a.  Ace shall keep all information confidential and proprietary and will not, without the written prior consent of TrueGreen disclose any such information to any third party, other than to our officers, trustees, agents, employees, and legal advisors, on a "need to know" basis, in furtherance of the purposes stated herein, and for no other purpose.

    b.  The Parties represent and warrant that the Parties have advised all our officers, trustees, agents, and representatives to whom proprietary information is communicated hereunder in the course of our duties and activities not to use or disclose such proprietary information, or any other confidential information regarding the business of the parties.

    c.  All proprietary information, engineering and prototypes paid for by TrueGreen shall remain the property of TrueGreen. Immediately upon the request of TrueGreen, Ace shall return any and all information and prototypes supplied to it by TrueGreen, and all copies thereof, with the exception of any specific materials paid for or provided by Ace to TrueGreen.

3.  The foregoing obligations of confidentiality and non-use shall not apply to:

    a.  Information which is in the current possession of the undersigned or is available to the general public otherwise than through the act or default of the undersigned or of their officers or agents.

    b.  Information obtained, subsequent to any disclosure from either party, from a third party who is lawfully in possession of same and which information is not subject to any confidential or non-use obligations to either party or to others.

4.  The undersigned Parties intend to examine the materials, prototypes and information provided by TrueGreen in order to develop prototypes of the specific products requested by TrueGreen and to make determinations from time to time to participate or to utilize the technology from time to time to develop commercially viable products.

5.  No specific information given to the Parties by each other shall be disclosed to any other party, unless so directed in writing by both Parties to this agreement.

1

6.     Nothing herein shall be construed as giving the undersigned any rights, title or interest in any information, design or prototypes supplied or paid for by one party to the other.

7.     The undersigned, separately and individually, and their associates hereby agree that his or her corporations, agents or consultants will not circumvent each others relationships with their respective distributors, dealers, vendors or others who are currently contracted or serving the needs of the respective parties, without written permission of the other party for a period of 3 years from the date upon which this agreement is entered into. This agreement is also effective for the signatories' heirs, assignees and designees. It is also understood that a signatory cannot be considered or adjudged to be in violation of this agreement when the violation is involuntary, due to situations beyond his or her control, such a Acts of God, civil disturbances, theft or other similar consequences.

8.     By signature below and execution of this agreement, the undersigned, separately and individually, and their associates confirm that any corporation, organization, firm, Company or individual of which the signers are a party to, member of, principal agent for, employee of, or otherwise that would benefit financially from this association, is bound by this agreement.

9.     Any controversy or claim arising out of or relating to this contract, or the breach thereof, and which is not settled by the Parties themselves, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association, with hearings to take place in the state of Washington, or where the aggrieved party resides; and judgment upon the award rendered by the Arbitrators may be entered in any court having jurisdiction thereof - including the award to the aggrieved signatory or party, their heirs, assignees, and or designees, for the total enumeration received as a result of business conducted with the parties covered by this agreement, plus all court costs, attorney's fees, and other charges and damages deemed fair by the Arbitrators.

Essentially the spirit of this agreement is one of mutual respect, trust and confidence, and one of reliance on each other to do what is fair, moral, ethical and equitable.

For: TrueGreen Electronics, Inc.

_____, Pres.
Signature & Title

Date: Sept 1, 2009

For: AcePower Electronics Co., Ltd

_____
Signature & Title

Date: Sep. 1 2009

2